DUNCAN, J.,
delivered the opinion of the majority of the Court.
The prisoner was indicted for the murder of Robert R. Smith; and was found guilty by the petit jury of murder in the first degree ; and sentence of death was pronounced by the Court.
On the trial, the dying declarations of the decedent were given in evidence to the jury, and this was objected to by the prisoner. Before this Court, the objection assumed three distinct grounds: .
1st. That the admission of the djdng declarations in evidence, is a violation of the bill of rights: the 8th article of which secures to evey citizen charged with crime the right to be confronted with the witnesses against him.
2d. That the Court permitted the dying declarations to go to the jury, and be heard by them, before having determined whether the decedent was in the condition at the time to render them legally admissible.
3d. That the decedent was not in the condition when he made the declarations to render them legally admissible as evidence.
After the verdict of the jury, the prisoner moved the Court for a new trial, upon the ground that the evidence *and the law did not authorize the jury to find him guilty of murder in the first degree ; and the motion being overruled by the Court, the prisoner thereupon, moved in arrest of judgment, on the ground that the verdict of the jury was rendered after the expiration of the term of the Nansemond Court; and after the time appointed bj law for the Judge who presided to hold the Court of Isle of Wight county. This motion was also overruled, and sentence of death pronounced upon the prisoner. The cause now comes up before the General Court, upon an application for a writ of error for the causes aforesaid.
In assigning the reasons for the opinion of the Court in this case, it is proposed to pursue the course of the argument of the prisoner’s counsel; and to commence with the application for a new trial, on the ground that the law and evidence did not justify the jury in finding the prisoner guilty of murder in the first degree. In other words, that the evidence did not make out a case under the law, of wilful, deliberate and premeditated killing. Without designing to enter into a disquisition upon the terms of our statute creating the distinction of murder in the first and second degree, we shall content ourselves with the reasoning of the General Court in Jones’s Case, 1 Leigh 598, and adopt it. We also concur with the prisoner’s counsel in their position, that under our statute, every homicide is, prima facie, murder in the second degree ; and in order to elevate the offence to murder in the first degree, the burden is cast upon the Commonwealth to bring it by proof either within the specific class of cases, such as killing by poison, or by laying in wait, &c. enumerated in the statute, or within the general class of “wilful, deliberate and premeditated killing.” On the other hand, in order to reduce the offence from murder in the second degree to manslaughter, the burden is cast upon the accused. As the homicide in question has been found by the jury to *be murder in the first degree, the question arises, was there sufficient evidence before the jury to elevate the offence to that grade? As there was no evidence tending to bring the homicide within the specific class of cases which by the statute are made to constitute murder in the first degree, does the evidence bring it within the general class of “wilful, and premeditated killing?”
The principal difficulty, we apprehend, that exists in distinguishing between murder in the first and second degree, is in deter *494 mining what proof is sufficient on the part of the Commonwealth to shew that the killing was wilful, deliberate and premeditated. In order to elevate the offence from murder in the second to murder in the first degree, there must be proof that the accused deliberated ; and that the killing was the result of such deliberation. This being proved, it is not material how recently the deliberation preceded the killing. The practical difficulty in cases of this kind, is, in determining'.what.is sufficient evidence,-qf deliberation. A homicide rarely declares his intention; nay, he often, under the disguise of friendship and kind offices, sedulously conceals his fatal purpose. Often the resolution to kill may be fixed, but the time and the means not determined upon. The most wilful, deliberate and premeditated murders would often go unpunished unless means existed of proving the intention, independent of the admissions or declarations of the homicide. We are of opinion that such means are furnished by the rule: “That a man shall be taken to intend that which he does, or which is the immediate or necessary consequence of his act.” 2 Stark. Evi. 738, and the authorities there referred to.
To illustrate this rule, let us suppose that a man is seen, within shooting distance of another, to raise his gun, take aim, and fire, and the man falls; the ball having inflicted a mortal wound: and that these are all the *facts proved; is this murder in the first or second degree? To respond to this enquiry, we have only to apply the rule just quoted. The taking aim, and firing such a weapon, one from which death would most likely ensue, would itself be prima facie evidence that he intended it; and was, therefore, a wilful, deliberate and premeditated killing.
Now, let us apply this rule to the prisoner’s case; and in the first instance-, to examine it as if all the evidence which are technically classed as dying declarations were out of the case. Some of these declarations, it might be insisted, were parts of the res gesta; and as such, proper evidence. These will be adverted to presently;. and the reasons assigned why they ought to be admitted as part of the res gesta.
The proof to which we will now refer as exclusive of the dying declarations, is as follows: On the evening of the 13th of September last, (the evening of the homicide,) the decedent, who resided 18 miles from Suffolk, being on a visit to his estate adjoining, or near to the town of Suffolk, came to the town, and was at the Washington Hotel. The prisoner who resided in the town of Suffolk, casually met him there: friendly salutations passed between them: a mixed conversation took place in the company; (there being several persons present;) when about the hour of 7 o’clock, the prisoner asked the decedent to walk with him, as he wished. to say something to him. The decedent complied, and they walked off together towards Bayly’s storehouse; which is about SO feet from the end of the porch of the tavern from which they started: and Basdy’s store is in view of persons stationed in the end of the porch. No person seems to have observed the parties after they started on their walk. The prisoner had with him a sword cane. After the lapse of between 5 and 10 minutes, the decedent was seen to approach the tavern, staggering. He fell before he got to the porch. Some *of the company who were in the porch went to his aid, carried him into the porch, and laid him down. He was pulseless, and his countenance was pale and death like. Some of the persons present thought he was dead. He lay in this situation some minutes, when he revived a little, turned himself over and vomited. Remedies were applied to restore sensibility, and in about 10 minutes he was sufficiently restored to be able to speak; and upon being asked what ailed him, ‘ ‘he put his hand to his left breast, and said here it is, here it is.” — “Hunter Hill asked me to walk out, and stabbed me here.” (See Duke’s evidence, page 8 of the record.) His clothes were opened, and a wound discovered in. the left breast, opposite the region of the heart. It was also proved that the decedent from the time he was discovered to be wounded, looked pale and haggard; his extremities were, cold; clammy sweat exuded from him; he laboured under a great bodily prostration; he complained of coldness, and pain in his bowels.; his voice, though distinct, was weak; his breathing gradually became more difficult; his manner was composed and firm; and about 9 o’clock of the morning he died. A post mortem examination of him. disclosed that the wound had penetrated into the left ventricle of the heart, and was inflicted by an instrument, such as a sword cane; and that the pericardium contained from 6 to 12 ounces of coagulated blood. It was also proved that some months prior to the supposed murder, the prisoner had taken umbrage at the decedent, who was a major of militia, for not appointing him captain of a patrol; that upon one occasion speaking of that matter, he remarked, “major Smith must mind how he cuts his cards with me;” and on another occasion, he remarked, “major Smith has treated me rascallj'; and that he (the prisoner)' had come to a low ebb if he could not have a patrol commission.” It was also proved, that subsequent to the affair of the patrol, the relations of the parties were apparently amicable.*The prisoner was the tenant of the deceased. Common place civilities passed between them; but there was no other evidence of a change of the prisoner’s feelings growing out of the patrol affair. It was further proved, that on the evening of the alleged murder the prisoner was not seen after starting to walk with the decedent; that he fled that night, and was arrested in the State of New York. On the part of the prisoner it was proved, that he had on the day before the night of the alleged murder, and on preceding days, paid out money that he had collected as a constable; that he had *495 appointed to go at 12 o’clock that night in search of a runaway slave; and to dine on the next day with a friend. The foregoing includes, we believe, a fair synopsis of all the evidence except the ‘ ‘dying declarations” of the decedent: unless the first expression of the decedent upon his revival in the porch, to wit: “Hunter Hill asked me to walk out, and stabbed me here,” is tobe excluded as not constituting a part of the res gesta. How then will the prisoner’s case stand upon the evidence as stated? Has the Commonwealth made out a case of wilful, deliberate and premeditated killing? And here, it should be premised, that this was a question resting upon the tendency and weight of the evidence; and proper for the jury to determine. And where the jury and the Judge who tried the cause concur in the weight and influence to be given to the evidence, it is an abuse of the appellate powers of this Court, remote as it is from .the scene of the transaction, having the evidence only on paper, divested of many elements which enter into every jury trial, and which from their nature cannot be presented on paper,' to set aside a verdict and judgment, because the Judges of this Court, from the evidence as written down, would not have concurred in the verdict. Although we have, contrary to the rule of the English Courts, decided that it is within the appellate powers of this Court to set aside a verdict because it was not authorized *by the evidence, yet it is only in a case where the jury have plainly decided against the evidence, or without evidence, that this appellate power will be exercised. M’Cune’s Case, 2 Rob. R. 771. The evidence we have quoted, establishes these facts: That the prisoner had sometime prior to the fatal transaction, taken umbrage at the decedent. His pride had been wounded. To what extent this feeling had fermented in his bosom we know not: but we do know, that in some temperaments, the feelings of wounded pride are more durable, and more vindictive than those produced by any other kind of injury : and it by no means follows that the most vindictive and deadly purposes may not be concealed by a social demeanor. Malice can caress and smile upon, and then stab its victim. This condition of the prisoner’s feelings was, to say the least of it, a circumstance proper for the consideration of the jury; a jury from the vicinage, and who are presumed to know the man: and the weight that should be given to that circumstance is a matter that an appellate Court cannot determine. The next fact is, that the prisoner asked the decedent to walk with him, as he wished to say something to him. Why he desired privacy does not appear? He took the decedent from the friends and company that surrounded him into the shade of the night. He had with him a sword cane; and in the short space of between 5 and 10 minutes, the decedent is seen returning from whence he started — he falls —rises—staggers—falls again, in a state of utter insensibility, and physical prostration, from a stab in the heart, by an instrument such as that in the possession of the prisoner: and the prisoner under the cover of the night, flies from his home and his country. Suppose the evidence stopped precisely a.t this point — the first enquiry would be, who stabbed the decedent? He was seen going off in company with the prisoner at his request, who is armed with a sword cane; and who it is known, *had entertained feelings of umbrage at the decedent some time prior thereto. In a very few minutes afterwards, the decedent is found mortally stabbed, with an instrument such as a sword cane ; and the prisoner has fled. Upon these facts alone, could the jury have come to any other conclusion than that the prisoner stabbed the decedent? Having arrived at that conclusion, the next enquiry would be, was the act wilful, deliberate and premeditated? To ascertain this, they would look into the previous condition of the prisoner’s feelings; they would couple it with the fact, that it was the prisoner who procured the decedent to leave the company and walk with him under the shade of the night: and they would also couple these with the facts, that in a few minutes, the blow was struck with a weapon from which death would likely ensue; that it was aimed at a vital part; and sent with force sufficient to reach the heart; and that the prisoner fled. Are not these circumstances' sufficient? Naj", could the jury have come to any other conclusion than that it was murder in the first degree? But if we connect with these circumstances, the first declaration of the decedent, ‘‘Here it is — here it is,” placing his hand on his left breast, “Hunter Hill asked me to walkout, and stabbed me here” • — as part of the res gesta' — the fact of the killing by the prisoner is proved beyond all doubt; and the circumstances before referred to shew the quo animo with which it was done. That this declaration is part of the res gesta, remains now to be shewn. There can be no doubt that the situation and condition of the decedent after he received the wound; his staggering as he approached the tavern; his falling; his pulseless and insensible state; his vomiting; the coldness of his extremities ; his physical condition ; the remedies resorted to; all he said and did up to the period of his death, except his declaration as the commission of the act, are all parts of the res gesta: and why not his declarations *as to the commission of the act? The reason is, that he may have fabricated or made up a story. But on the one hand, if under the circumstances of the case he could not have-had time to make up a story, and that the declarations were made when the lis mota did not exist, then they may be received as part of the res gesta. On the other hand, if made after time sufficient had been allowed to fabricate a story, or the lis mota may be supposed to exist, they are not to be considered as part of the res gesta. In this case the decedent was stabbed to the heart; he immediately attempted to return to the *496 tavern; he fell, recovered to his feet, staggered, fell again, and fainted; and remained insensible for about 10 minutes, when, and after the application of stimulants, he revived so as.to be able to speak; and immediately made the'• declaration referred to. Where was the time within which he could have arranged his thoughts, and fabricated a story? A priori a stab in the heart would instantaneously suspend the powers of reflection ; and we have seen its physical effect upon the deceased. All the time then from receiving the stab until he revived from his fit of fainting he was clearly not in a condition to arrange his ideas and fabricate a story: and the declaration was immediate upon his revival. In Rex v. Foster, 25 Eng. C. L. R. 421, the statements of a deceased who had been run over by a cabriolet, made recently after receiving the injury, were allowed as part of the res gesta. So in Skinner 402, referred to in a note to Rex v. Foster, Holt, Judge, permitted the statements of the wife made recently after being wounded by her husband, and “before she had time to devise any thing for her own advantage,” to be given as part of the res gesta.
All that is necessary, according to these cases, to make the declaration part of the res gesta, is that it should be made recently after receiving the injury, and before he had time to make up a story, “or. to devise any thing for his own advantage.” ■' Tested by this rule, the statement referred to is clearly admissible.
*'The other statements of the deceased, and which were allowed to go in evidence, and to which as yet there has been no reference, were substantially as follows: “I was sitting in the porch, and Hunter Hill came up, and asked me to walk out with him. I accompanied him as far as the house where Bailey formerly lived. When opposite the steps of the piazza, I proposed to take a seat; he said no, let us go a little further down. I said no, here is a good place, let us sit down here. They seated themselves, and entered into a conversation. After a short time Hill brought up the old patrol affair. I explained to him, and thought I had satisfied him on that subject. He insulted me, and called me a damned scoundrel. I arose, a'nd as I arose he stabbed me. He turned off to run. I let him have it some where about the nose. At first, I thought I was not stabbed, but merely punched with a stick. I tried to get back; I fell, and then I rose again.” And upon being interrogated whether he had any notice of Hill’s intention to stab, he replied, “None whatever.” The foregoing constitutes a summary of his statements, made at various times during the night; and were permitted to go to the jury on the ground that they were made under the consciousness of approaching death. These dying declarations, taken in connection with other evidence upon which we have commented, and which we supposed to be sufficient to have justified the verdict, without the aid of the dying declarations, establishes, fully, every ' ingredient of murder in the first degree. Taken together, they prove that the stab preceded the blow given by the decedent; and that the stab was inflicted as the deceased was, rising from his, seat. But were it otherwise, the prisoner cannot take shelter under that which is the natural and probable consequence of his own deliberate and premeditated act. Nay more, we are of opinion, that a mortal wound given with a deadly weapon, in the previous possession *of the slayer, without any, or upon very slight provocation, is, prima facie, wilful,'deliberate, and premeditated killing; and throws upon the accused the necessity of proving extenuating circumstances. We do not mean to say that there may not be other circumstances besides the previous possession of a deadly weapon, which would manifest that premeditation, and deliberation, required by the statute to constitute murder in the first degree; as in the case of mulattto Bob, cited in a note to the Commonwealth v. King, 2 Virg. Ca. 85.
We come now, to the exceptions to the admissions of the declarations of the deceased as evidence.
1st. Is such evidence contrary to the bill of rights? If his question is to be answered affirmatively, then for nearly 70 years past, the Courts of this Commonwealth have been in the. constant practice of violating the bill. of rights in a most important particular. We ad.mit that the practice of the Courts, however long, and uniform, is not of itself a valid answer to the objection; and that this Court is bound to decide it now; not upon practice, but upon principle. How does this question stand? One of the learned counsel for the prisoner maintained, in the argument, that the provision in the bill of rights, that the accused had a right to be confronted with the witnesses against him, was a new principle ; the offspring of American liberty: and that it had no existence in the great charter of English liberty. i In this respect, we think the learned counsel is in error. Magna Charta provides that a subject accused of crime, should be tried by his peers; and according to the principles of the common law; and it is a well established principle of the common law, that an accused should be tried by a jury of the vicinage: that ’ the trial should be public; and the witnesses against him examined in his presence. This was no new principle. It was familiar to Virginia in her colonial-condition. The question then arises, what was the doctrine of the common law *as it regarded this rule of evidence? Without attempting to ascertain the antiquity of the earliest decisions of the British Courts affirming the rule, it is sufficient to state, that long anterior to the year 1776, the period of the declaration of the bill of rights, the rule of evidence was well established. And it is remarkable, that in all the commentaries it underwent in England, it was never supposed that the rule was a violation of the rights of the subject *497 as secured by Magna Charta. The rule is one of necessity. It is analogous to that which authorizes the admissions of the prisoner to be given in evidence against him. In that case, he is not the witness; neither is the dead man. His declarations are facts to be proved by witnesses, who must be confronted with the accused. We are therefore of opinion, that the admission of dying declarations as evidence, is not repugnant to the bill of rights.
Without referring in detail to the numerous adjudications that have taken place in England, and in this country, upon the question, we consider it settled, that declarations in articulo mortis by one who is conscious of his condition, are admissible evidence; and that the fact of such consciousness may be established otherwise than by the statements of the decedent: as by the character and nature of the wound, his appearance and conduct, &c. Eor this we refer to Roscoe’s Crim. Evi. 29, and the authorities there referred to. The decedent is proved to have been a brave man, and his whole deportment shews him to have been a man of no ordinary firmness. He never said in terms that he was about to die. He made no disposition of his property. He sought no religious or spiritual comforter. He died calmly and firmly. And yet it seems to us impossible that any one can read the evidence in this cause without a thorough conviction that from the moment after he received the stab, he knew it to be fatal. It penetrated the heart. It made him reel and stagger like a *drunken man; fall and faint. His limbs became cold. He was seized with vomiting. His eyes were sunken ; his countenance pale and deathlike. A clammy sweat exuded from him. The action of the heart, pierced as it was, and surrounded with clotted blood, was so feeble that it could not send the blood to the extremities, or even the surface of the body. In a warm night in September, with hot bricks at his feet, and co/vered with half a dozen quilts and blankets, he complained of cold. There was no pulse in the wrist. The' supply of blood to the head was so scant, that when it was raised much above a horizontal position, he fainted. His removal up stairs brought on convulsions ; and there is good reason to believe that had he, at any time after his revival from the state of insensibility which followed the infliction of the wound, been placed in a perpendicular position, he would have instantly expired. Is it possible that all this could exist and he not know that death was grappling with him. The spectators all saw that death was upon him. The physicians, it is true, for a brief time deceived by their probe, supposed that the wound was superficial, and that he might recover; but he was not deceived. Upon being told that the physicians said the wound was slight, and that he would soon recover, he replied it is deep! deep! deep! His sensations told him it was deep, fatally deep. And how could it be otherwise, when it produced the effects above detailed. Upon one occasion, when the attendants were rubbing him with camphor, he told them to desist; “that it was the way of all flesh.’’ On another, he remarked, “it will soon be over.” Or, according to another witness, (whose testimony, if there was any conflict between the .witnesses, it was the province of the Judge below to weigh, upon the question of admitting the declarations, and of the jury to weigh after they were admitted,), “it will soon be over with me.” When asked whj he wished his wife sent for, he said, he was “growing *very weak.” He repeatedly said he was ‘ very weak” — ’“I feel no better.” He expressed his own fears that it was worse with him than the doctors thought it. He was heard frequently to be uttering ejaculations devoutly to the Eord; such as “O Eord,” “poor fellow;” and was heard to exclaim, “what will become of my poor family.” All these manifestations of his feelings strongly indicate, taken in connexion with the attendant circumstances, that he was sensible of the hopelessness of his, condition ; Which had been, from the first, constantly growing worse. All of them had preceded the last statement he made a little after 4 o’clock in the morning of the 14th; and this last statement was the exact repetition of all the statements he had uniformly made before. Upon carrying him up stairs about day-break, he remarked, “doctors, look out for me.” Erom this expression, it was argued that he yet entertained hopes of recovery. The expression “look out,” is equivalent to “take care,” and most probably referred to the necessity of extreme care and caution to avoid consequences similar to those which had been occasioned by raising his head from a horizontal position. This construction is strengthened by the fact, that as soon as he was laid down, he was seized with spasms. It is to be remarked, that during the whole time from the infliction of the wound until his death, he never expressed or indicated the belief that he would survive. It is true, that he manifested during the night at intervals, something like feelings of revenge towards the prisoner. But are such feelings inconsistent with the knowledge of the approach of death? Men of different temperaments are differently affected upon such an occasion.
The next objection is, that the Judge who tried the cause, permitted the dying declarations to be heard by the jury before he decided upon the sufficiency of the ground upon which they were admitted. The rule is now established, although for a time it was vibratory in *the English Courts, that the fact of the dying condition of the party must be determined by the Court, and not the jury. Regularly therefore, the evidence of that fact should be first laid before, and passed upon by the Court. That course was not pursued in this case. The preliminary evidence necessary to authorize the dying declarations to be used, and the declarations themselves *498 ■were heard together; the Judge reserving to himself the right, after hearing all the evidence, to determine upon the admissibility of the declarations. This was an irregularity, so far as the declarations indicating his condition can be separated from the rest, and if any injury could have resulted from it to the prisoner, it would have been error. But the only case in which the irregularity could work an injury, would be where the' testimony, after, being heard by the jury, was rejected by the Court as inadmissible. The declarations were decided by the Court to be admissible ; and if so, then no possible injury was done the prisoner. On the contrary, had the declarations been rejected by the Court, after having been heard by the jury and the prisoner had still been found guilty by the jury, impressions might have been produced on the minds of the jury; and tinge or colouring given to the case by it, prejudicial to the prisoner: in such a case the irregularity would probably have been error. Such, however, is not the present case. t
Note by the Judge. — Some of the Judges composing the majority, doubt the correctness of that part of the foregoing opinion which declares the declarations of the deceased made in the porch proper evidence as part of the res gesta; regarding them at the same time as clearly admissible as dying declarations.
The last question is, was the judgment in this case coram non judice, by reason of the alleged expiration of the term of the Nansemond Court?
The regular time prescribed by law., for holding the Circuit Superior Court of Nanse-. mond, was on the 12th day of October. The next Court of that circuit was that of Isle of Wight county, which by law was directed to be holden on Saturday, the 18th day of October. The verdict of the jury in this case was rendered on the 20th of October, and judgment of death was *pronounced at 9 o’clock A. M. on the 21st. The distance from the courthouse of Nansemond to that of Isle of Wight, is 17 miles, and is three hours travel. In looking into the statements regulating the times for holding the respective Courts of this Commonwealth, we find that the County Courts shall continue six days, unless the business is sooner determined. Here is an express statutory limitation of the duration of the terms of the County Courts. But there is no such limitation in the Circuit Court law. Bj the statute, each of these Courts ‘ ‘shall sit until the business thereof shall be dispatched, unless the Judge holding the same shall be compelled to leave the Court in order to arrive in time at the next succeeding Court of the circuit. ’ ’ And the statute further provides, “that if the Judge shall not attend on the first day of the term of any of the said Courts, such Court shall stand adjourned from day to day, until a Court shall be formed; if that shall happen before 4 o’clock of the third day.” By operation of law,- the Court of Isle of' Wight county stood'adjourned until 4 o’clock of Tuesday; Sunday being dies non; and sentence being pronounced at the Nanse-mond Court at 9 o’clock A. M. of the same day, the Judge had time to travel 18 miles, and arrive at the courthouse of Isle of Wight before '4 o’clock P. M. ‘
There being no limitation of the Nanse-mond Court, except that arising from the necessity of holding the Isle of Wight Court, when did that necessity arise? Was, it on thé first day appointed by the statute for holding that -Court; that is on Saturday ; or was it at any'time before 4 o’clock of the Tuesday following? The Legislature supposed causes might supervene to prevent a Court from being’ holden on the first day appointed for it; and as every county was entitled to a Court, it -provided-that if the Court was not opened on the first day appointed, it should stand over from day to • day,'until the close of the third day. The Judge, therefore *knows, when holding any of his Courts, that a time is appointed to hold another Court in another county of his circuit; and that if he does not hold that Court beforé 4 o’clock of the third day appointed for it, his failure will deprive j:hat county of its Court. But if he does hold the Court before 4 o’clock of the third -day, the county will have its Court; and the requisitions of the statute will be satisfied. And as there is no express limitation of the term he is holding, except that arising from the necessity of holding a Court in another county, and as that necessity does not become absolute until 4 o’clock of the third day, he will exercise his .discretion, resting upon his responsibility to the public: and if in his judgment, the ends of public justice will be best subserved by continuing the Court .which he is holding until the time shall arrive when he must depart, to hold the Court of the next county, so as not to deprive that county of its Court, he ought to do so; especially when by doing so, he retains to a citizen accused of crime, his right to a speedy trial. In this case, the Judge who tried the prisoner, had to decide between breaking off in the midst of the trial, and retaining the prisoner for trial at another term, in order to get to Isle of Wight Court on Saturday, or of finishing the trial, and still holding the Court of that county. He chose the latter, and we think he exercised his discretion properly. And for this view of the case, the Court feels that it is sustained by the reasoning of the Judges, and the judgment pronounced by the General Court in Mendum’s Case, 6 Rand. 704.
On the whole, therefore, the majority of the Court decides not to award the writ of error applied for in this case.
*BAKER, J.
This is a prosecution in which the prisoner has b'een convicted of murder in the first degree, and in which an objection, for the first time in this Court, has been raised to the admissibility of dying declarations in consequence of the 9th section of the bill of rights, which declares that in all capital or criminal *499 prosecutions a man hath a right to demand the cause and nature of his accusation, to be confronted with his accusers and witnesses, to call for evidence in his favour, and to a speed}' trial by an impartial jury of his vicinage, without whose unanimous consent he cannot be found guilty.
I think that it would not be a very difficult matter to shew from the mere phraseology of this portion of the organic law, that the peculiar circumstances of the case in question, that is to say,, of the admissibility of declarations made in articulo mortis, could hot have been in the contemplation of its framers; or intended thereby to be in any manner affected or controlled. The propriety of admitting such declarations has, for a long period of time, been recognized by the English Courts, and is now established by a series of incontrovertible adjudications. These decisions have been made in a country from which we have borrowed the most of our laws; a country in which, doubtless, a high regard for the security and liberty of its citizens, has, on proper occasions, been hitherto manifested; and in which is to be found a constitutional provision almost identical with our bill of rights. Delolme on the English constitution, page 122, when treating of criminal justice and enumerating the many guards provided by magna charta for the protection and security of the accused, says: “When at length the jury is formed, and they have taken their oath, the indictment is opened, and the prosecutor produces the proofs of his accusation. But, unlike the rules of the civil law, the witnesses deliver their evidence in the presence of the prisoner: the latter may *put questions to them : he may also produce witnesses in his behalf and have them examined on oath. At page 130, of the same work, the author is still more distinct and emphatic in relation to the same subject. He says, that they do not permit that a man should be made to run the risk of a trial, but upon the declaration of twelve persons at least, (the grand jury). Whether he be in prison, or on his trial, they never for an instant refuse free access to those who have either advice or comfort to give him. They even allow him to summon all who have any thing to say in his favour. And lastly, what is of very great importance, the witnesses against him must deliver their testimony in his presence. Notwithstanding this clear and decided language of the English constitution or bill of rights, the Courts there, during a long series of years, and on many occasions, as before intimated, have sanctioned the competency of dying declarations. And I have found no case in which the right had been questioned as an infraction of the constitutional liberty of the accused.
In Virginia the same principle of law has been repeatedly adopted; and if the point now presented was never before brought distinctly to the consideration of this Court, intimately connected as the principle involved has been and is now with the criminal administration of justice, it must be, I suppose, because the doctrine was considered too incontrovertibly established as a necessary element in our judicial administration, to be altered or disturbed. The bill of rights of Virginia was first adopted in the year 1776, and again adopted in January 1830. After the first, and before the: latter period, several cases which have been referred to in the argument, have been decided by the General Court; in which the propriety of admitting dying declarations,, under certain circumstances, has been sanctioned and approved; and the decisions-so made by the highest Criminal Court of the Commonwealth, have been distributed *and made known in every county of the State. Now, under these circumstances, is it not remarkable, if the principle of admitting declarations in ar-ticulo mortis be justly liable to the objections which have been urged upon the Court, that the people of the Commonwealth should have acquiesced so long without complaint? And is it not still more remarkable, that the members of the late convention, composed as it was of many of the most pure and enlightened men of the State, including many of the Judges and others belonging to the legal profession, should have failed to provide a remedy for the supposed mischievous consequences, which, by the decisions of the General Court, had been introduced and repeatedly established as one of the settled doctrines of the law. It seems to me, therefore, upon every principle of legal propriety, that the .Courts of Virginia cannot and ought not to do otherwise than adhere to the doctrine fully and often established by the decisions of this Court, before referred to.
Upon the motion for the new trial, made in the Court below, I do not think much need be said. As I understand the law in England, in cases of felon}', a new trial cannot be granted, even on the application of the prisoner, upon the ground that the verdict is contrary to evidence. In that country as in this, in criminal cases, the jury are the exclusive judges both of law and fact; liable, however, to be advised or instructed as to the law by the Court, whenever the Court deems it right to do so; or whenever called on by the attorney for the Commonwealth, or the counsel of the accused, or by the jury. A verdict under the English law, both as to the fact, and the degree of the offence charged, is so far obligatory upon the Court that it cannot be set aside because the Judge may believe it not warranted by the evidence; but the prisoner, if entitled to redress, may seek it by an application for a pardon.
*The same rule, I understand, has been adopted in New York; but in Virginia and other States, a different practice prevails. In Ball’s Case, 8 Leigh 726, the question as to the propriety of adopting the rule of the English Courts on this subject, was for the first time brought to the consideration of the General Court, and the Court being unwilling, for .reasons stated *500 in that case, to sanction the English rule in this respect, decided that that rule was not applicable in Virginia; and accordingly-awarded a new trial. But that authority distinctly shews the circumstances under which the doctrines of the English Courts in this respect, may be departed from. The principle settled in that case is, that the Court, as a preliminary to its interposition, must be satisfied that a clear and palpable error has been committed by the jury. And in M’Cune’s Case, 2 Rob. R. 771, this limitation is imposed, and in language still more clear and decided; thereby establishing, as I consider, that the indisputable right of the jury in criminal cases is to pass, finally and absolutely upon cases in which doubt is involved, either as to the fact charged, or as to the degree of the offence.
Nor is there any just reason to apprehend any violation or infringement of the rights of the citizens of the Commonwealth', charged with crime, from the strict and faithful application of this rule.
I know, and many of the members of this Court, I presume, know, that the juries called and sworn in criminal cases are too often inclined to favour the accused, either because of the want of firmness to meet with promptness and decision the responsibility devolved upon them by their high and important duties, or because of a sense of mercy and humanity unwarranted by the facts.
With these views, and under these circumstances, then, I will now proceed briefly to examine the facts of this case; leaving many of its minute circumstances to *be investigated by other members of the Court now present. I shall not attempt to shew what character or description of homicide is necessary to constitute murder in the first degree under our statute ; nor what should or ought to -be the precise extent, or duration of that deliberation, or premeditation, which is required by the statute, when the prisoner is sought to be convicted of a “wilful, deliberate and premeditated killing.” This subject, on several occasions, has been before the General Court; and in the cases here referred to, principles have been settled and established, bearing materially, I think, upon this case; but in my view of this case, it will not be necessary to invite particular attention to them. On the 13th of September, then, as the record shews, the prisoner and the deceased met at an early period of the night at the Washington hotel in the town of Suffolk. The prisoner shortly after-wards, asked the deceased to take a walk, stating in substance that he wished to have a talk with him. They walked out together; and took seats on the steps of Bailey’s store; a distance not less than fifty feet from the hotel. In five or ten minutes afterwards, the deceased was seen staggering and falling near the door of the hotel; and when taken up, and put on the floor of the porch, was unable to speak, and in a state of perfect insensibility, cold, pulse- | less, and having a death-like appearance; but after the application of stimulating remedies, and other means which were resorted to, in a short time his reason returned, and he stated that the prisoner had stabbed him. He soon afterwards, gave a more detailed account of the matter, in which he represented that when he and the prisoner arrived at the steps of Bailey’s store, the prisoner expressed a wish to go further; but upon objection being made by the deceased, they both sat down on the steps: that immediately afterwards the prisoner brought up the old patrol affair, and insulted the deceased; and that as he was in the act of rising from his seat the prisoner stabbed him.
’"In relation to the patrol affair of which the deceased had spoken, two witnesses, Parker and Drewry, give evidence, in which they speak of conversations held with the prisoner about the last of May, or the first of June previous to the death of Smith. It appears that the deceased, as major of the county of Nanse-mond, was authorized when necessary to appoint patrols; and the witnesses Parker and Drewry, having heard that the deceased had given some offence, and probably to the prisoner, in relation to that matter, they had the conversations referred to with the prisoner, in which the prisoner used towards the deceased language somewhat of menace and threat; and certainly evinced a state of feeling towards the deceased, of a decidedly hostile character: and we have no satisfactory evidence in the record to shew that that state of feeling was changed or removed; or if changed at all, to what extent the prisoner’s umbrage had subsided. The deceased was killed by a stab in the heart; and I assume it as a fact, that the mortal blow was given without provocation, by the prisoner, with the dirk or sword cane which the prisoner had in his possession a short time before the death. It also appears, that the prisoner escaped immediately, or without much loss of time: that in about days he was arrested in the City of New York; and brought back to the place from which he had fled. The foregoing facts, I think, are sustained by the record; and although in the man3 depositions which are annexed as a part of it, there are manj facts and circumstances referred to, bearing somewhat, in respect to the guilt of the prisoner, an equivocal import, yet I am satisfied that the details of the case above briefly stated, are legitimate deductions from the whole subject presented by the record.
View the case then in any aspect in which it can be properly considered, is it undoubtedly true that the prisoner has been guilty of a most atrocious offence. But *the jury having found him guilty of murder in the first degree, the en-quiry still is, can this Court undertake to annul their verdict upon the ground that it is not sustained by the law and the evidence. What is in this record to forbid the supposition that the prisoner, when he set *501 out to walk with the deceased from the hotel, was smarting under a fancied sense of wrong, and mortified pride, growing out of the affair of the patrol commission to which I have before alluded? Why did the prisoner, if his object were merely to hold a friendly conversation with the deceased about a matter of business, walk so far from the company which they had left at the hotel; and even afterwards express a desire to go further? Why did the prisoner so quickly leave his home and his country after the mortal blow was given, that the officers of justice could not execute their commission, though sent in almost immediate pursuit of him? And finally, why did the prisoner resort to the use of so fatal an instrument as the dirk, under the shade of night, while removed from the observation of others? These questions present to the mind some of the important matters which the jury .was bound, and no doubt did gravely consider. The result of that consideration, faithfully, honestly, and impartially exerted, as we are required to suppose, is 'the conviction of the prisoner, of murder in the first degree. And now this Court, acting in its appellate or supervisory character, is called ' on to set aside the verdict, and give the prisoner another trial; and I humbly conceive, that upon every consideration of justice, of law, and public policy, the Court has no right to disregard and set aside a verdict thus obtained.
The next'objection relied on by the counsel of the prisoner, is that the dying declarations of the deceased ought to have been excluded. Before I proceed to notice more particularly', however, the grounds on which this objection was placed, it will be proper briefly to advert to the argument on the part of the Commonwealth, *touching the propriety of admitting a part of the declarations on the sole ground that they constituted a part of the res gesta. X understand the law, in restricting dying declarations to cases of trial for homicide, means merely to refer to declarations offered on the ground that they were made in ar-ticulo mortis; for where they constitute part of the res gesta, or come within the exception of declarations against interest, or the like, they are admissible, as in other cases, irrespective of the fact, that the de-clarant was under the impression of death. The authorities on this, subject, I admit, (but upon what sound principle I have not been able to discover,) do seem to leave it doubtful whether declarations offered as a part of the res gesta should be received for the purpose of shewing merely the prostrate condition of the party, the nature or kind of instrument with which the wound was inflicted, and the dreadful outrage which may have been perpetrated; or whether such declarations ought not to be admitted as evidence to establish moreover the identity of the perpetrator.
In cases, other than in prosecutions for homicide, the authorities clearly establish, that acts or declarations constituting a part of the res gesta would be competent evidence without limitation or restriction ; and as declarations constituting a part of the res gesta, in my opinion, are equally an infallible test of truth, as declarations made in extremis, I can see no good reason why the principle of reception should not be as broad in the one case as in the other. If the principle then, of receiving the declarations constituting a part of the res gesta be right and proper not only for the purpose of shewing the outrage committed, but also the identity of the perpetrator, I should have no difficulty in declaring from the facts clearly and distinctly shewn by the record in this case, that the first declarations of Smith made in the porch of the Washington hotel, ought to be received on that ground as evidence. But as my mind is not free *from doubt on this point, I am disposed to consider it as a matter which should have no weight against the prisoner; and will proceed to notice the next branch of the same subject.
Were all the declarations of the deceased made in extremis, or no? It is essential to the admissibility of these declarations, and is a fact to be proved by the party offering them in evidence, that they were made under a sense of impending death. But it is not necessary that they should be stated, at the time, to be so made. It is enough if it satisfactorily appears, in any mode, that they were under that sanction : -whether it be directly proved by the express language of the declarant, or be inferred by his evident danger, or from his conduct or other circumstances of his case. It is the impression of almost immediate dissolution, and not the rapid succession of death in point of fact, that renders the testimony admissible. On the subject of declarations as evidence, many cases have been referred to, in some of which the declarations were excluded, because the facts established shewed that the deceased had hope of recovery ; while in others the declarations were received, because of the total absence of such hope. In some of the cases also it was decided that the apprehension of death was made apparent by the declarations of the deceased; while others were decided against the accused, independently of and unaided by such declarations. Hence, every case of this description, it seems, must be settled mainly and essentially upon its own peculiar circumstances; and we ought not to' consider .this case as governed by another, which, in some important particulars, may be different from it. In truth, it is barelj' possible to suppose that any case has ever occurred, or ever will occur, in all respects like this. And I apprehend, that one great error in the argument of the prisoner’s counsel, in opposition to the admissibility of the dying declarations of the deceased in this case, consists in the fact of their having ^considered the testimony in detached parcels, rather than as a continuous narrative, leaving one part to explain others. In this case, the deceased made no *502 express declaration, that he felt the approach of death, and expected shortly to die; and yet the whole evidence shews that he was in a dying state, and was aware of it, from the moment at which the mortal blow was given, to the time of his death; which occurred only twelve or fourteen hours afterwards. He was stabbed in the heart; the instrument with which the injury was inflicted, having penetrated that vital organ, between one and two inches. In returning from the place at which he was wounded, he fell to the ground, then rose and fell again; and when found prostrate on the earth, he was unable to speak. He was then placed on the floor of the porch, apparently in a dying state; but the stimulating remedies which were soon applied, enabled him, after some minutes to make known his hopeless condition, by stating that the prisoner had stabbed him; and pointing to the wound near the region of the heart. During the remaining part of the night, and until the hour of nine •o’clock next morning, when he died, no material change took place. His grievances were made known by one uniform mode and manner of conversation.
There seems to have been throughout the whole time referred to, almost an entire suspension of his vital powers. His extremities were cold; his countenance had a deathlike appearance, and his pulse nearly gone; besides other indications usually given by a man struggling in the agonies of death. The deceased, however, during the whole period of his suffering, except a short time soon after he was struck down, was in his perfect senses, and talked but little; making but few allusions to matters úncpntíected with the cause of his affliction’s ; and even of those, generally speaking, with great decision, calmness and propriety. He could not probably have been more communicative, in consequence of the rapid decline *of his physical powers, while the hand of death was upon him: for the evidence shews, that although his words were distinctly, uttered, he yet spoke in a subdued tone of voice. The deceased is represented to have been a brave man; but still somewhat of a compromising disposition: by which I understand that he possessed courage, sufficiently tempered with justice and discretion.
He made no express declaration, as I have before remarked, of his apprehension óf death; but on several occasions, and at different periods of the night on which he died, he made remarks strongly indicative of his belief, that death was near at hand; while on the other hand, he did not at any time during his extreme illness, express hope of recovery; or say any thing which, by fair construction, shewed he expected to get better; but seemed to submit to his fate with calmness and patience; and manifesting, generally, less irritation and excitement, and more propriety of conduct, than would be consistent with the infirmity of many others under similar circumstances. '|
It is proper here, however, to notice otherwise, than by the foregoing general review of the evidence, one or two matters, upon which the counsel of the accused relied. The first is, that the deceased was informed that the physicians thought his wound only slight. In answer to that, it seems to me, that it is sufficient to say, the record shews that whenever that or similar matters, were communicated to him, either by words or signs, he instantly repelled the suggestions as unworthy of his confidence. The next ground above referred to, is founded on the fact that the deceased manifested a desire that the prisoner should not be permitted to escape. And upon the further fact, that on one occasion, as appears by the record, the deceased manifested towards the prisoner strong feelings of hostility. Considerations like these, in the absence of evidence to the contrary, owing to the natural feelings and constitution of some men, *might well be considered sufficient to shew that for the time being, the party was unconscious of his dying condition, while in respect to others differently constituted, the contrary presumption would arise; and therefore the weight of the argument urged in this respect, must be greatly diminished.
Besides, under the facts and circumstances before referred to, to my mind it is clear, that the objection here alluded to, if valid for any purpose whatever, was one which applied to the credibility of the evidence, upon which the jury alone was competent to decide.
After a due consideration, then, of all the foregoing, facts and circumstances, I come to the opinion, that it would be both unreasonable and unnatural to suppose, that the deceased, when he made the declarations in question, was not fully and entirely conscious of impending death.
Upon the face of the record, a further question arises; and that is as to the form or manner in which the evidence was presented to the jury. It is urged as an objection, that the dying declarations were allowed to go as evidence to the jury, before the Court decided upon their competency. This, if true, is certainly a violation of the last rule of practice on the subject; though perfectly consistent with the course of proceeding in England at the time of the decision of Woodcock’s Case; from which it appears at that period, the whole subject was left to the jury, as a mixed question of law and fact. Conceding, however, as is indicated by the recent decisions on this subject, that the regular and proper course of proceeding is, that the Court shall first decide as to the competency of the declarations, let us examine the record to see, if by any fair construction of it, the Court below has done any thing in violation of this rule; or any thing calculated to abridge the rights of the prisoner. The opinion of the Court, to which exception was taken, is, that it was proper to receive *full proof of all 'the declarations, before determining upon their compe *503 tency as evidence for the jury. Now, then, it seems to me, that the Court has done nothing more than to decide that before its judgment was expressed upon the competency of the declarations, it was necessary and proper to hear, not only a part, but all the declarations. The Court never intended, and such, I think, is the fair and proper construction of the record, that the jury should receive, or that the jury should be permitted to receive, the declarations of Smith, before the question of competency or admissibility was previously settled. Now, to decide upon the competency of dying declarations, would it not be often as necessary to hear the declarations themselves, as to hear proof of any other fact bearing materially upon the state of the deceased’s mind. If the Court entertained doubt upon the question of admissibility, upon evidence applying merely to the condition of the deceased, would not the Court be authorized to hear the declarations, even in the presence and hearing of the jury; and to weigh and consider the manner and character of such declarations, with the view to decide upon their competency? In some cases the declarations might be so inseparably united with the other facts in the case, that the witness could not speak of one, and omit the other, so as to give a true and faithful account of the affair; in which event, the prisoner himself might be the sufferer. All, I think, that was done by the Court below in respect to this matter, was, that which was done by the Court in the case of Rex v. Van Butchell, 14 Eng. Com. Law Rep. 493, in which the Judge, under similar circumstances, remarked, “I must hear all that the deceased said ; and I must judge from what he said whether he had that impression on his mind which made his evidence admissible. ”
But upon the supposition that the Court below did authorize the jury to receive the declarations of the deceased "'before the preliminary question as to their admissibility was settled, still it seems to me that nothing has been done, of which the prisoner has a right to complain. If it be true, that the admission of illegal evidence, however unimportant, be sufficient to set aside a verdict, that surely will not warrant the opinion that in a case where the jury received the testimony a short time before the Court was prepared to give it to them, the verdict should for that reason be also set aside: for the jury at last has only been permitted to hear such evidence as it was their province to receive and consider; and I know no principle of reason or law, which, apart from other considerations, will carry the doctrine above referred to, so far as to authorize the Court to treat the verdict in that case as a nullity.
The last objecdon urged against the judgment of the Nansemond Circuit Superior Court is, that there was no authority to pass sentence upon the prisoner, because the term of that Court, as the petition alleges, had lawfully expired. The case of the Commonwealth v. Mendum, decided by the General Court in the year 1828, settled the principle involved in this; and no contrary opinion has been given or intimated by that Court, and no subsequent act of the Legislature has in the slightest degree disturbed or altered it. It seem to me, therefore, that the Judge who decided this case in the Court below, could not upon the authority of Mendum’s Case, without committing an obvious breach of duty, have refused to go on with, and finally decide the prisoner’s case, after the expiration of the term, as he did; and moreover, if he had done otherwise the prisoner would have had just cause to complain of the action of the Court, as an infraction of his rights.
BROWN, FRY, and CHRISTIAN, J., dissented.
Writ of error refused.
* APPENDIX.